BOROUGH OF ELMWOOD PARK, FORMERLY BOROUGH OF EAST PATERSON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. ROBERT E. FALLON, JR., DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 5, 1974—Decided April 22, 1974.

52

Before Judges Kolovsky, Fritz and Crane.

*Mr. Stephen R. Spector* argued the cause for appellant (*Messrs. Ferrara, Glock & Spector*, attorneys).

*Mr. Joseph L. Conn* argued the cause for respondent (*Messrs. Conn & Kluger*, attorneys).

*Mr. William F. Hyland*, Attorney General of New Jersey, attorney for Civil Service Commission (*Mr. George F. Kugler, Jr.*, former Attorney General of New Jersey, and *Mrs. Erminie L. Conley*, Deputy Attorney General, filed a Statement in lieu of brief).

The opinion of the court was delivered by
Kolovsky, P. J. A. D. After a hearing before the governing body of the borough, respondent Fallon, a police officer, was found guilty on several charges. The penalty imposed

was removal from office. Fallon appealed to the Civil Service Commission. Following a hearing before a hearing officer, at which Fallon elected not to testify, the Civil Service Commission found Fallon guilty of some but not all of the charges, concluded that removal was not warranted and substituted a penalty of six months suspension, effective January 6, 1972, the date Fallon was originally suspended pending a hearing on the charges against him.

The borough appeals, arguing that Fallon's conduct and derelictions warranted his dismissal from the police department. We agree and reverse.

■ The record in this case consists only of the testimony offered by the borough in addition to admissions made by Fallon's attorney at the hearing. On the record here, and in the absence of any testimony or explanation by Fallon, there is no warrant for not giving full credence to the evidence offered by the borough. As the court said in *Wratchford v. Millburn Tp.*, 105 *N. J. L.* 657 (E. & A. 1929), in affirming the township's dismissal of a police officer:

> The omission of a party to an action to testify to facts or to produce evidence in explanation, except where the evidence is not peculiarly within his power, or is merely cumulative, raises a presumption against his claims. [at 658]

■ The first charge of which the Commission found Fallon guilty was that he had had in his possession and had transported across a state boundary line "a certain quantity of marijuana." The proofs were that in February 1971, some two months after Fallon was appointed a police officer and while he was attending a police academy, he visited a rock concert in Massachusetts and brought back a glassine bag containing marijuana to show to a fellow police officer who had never seen the substance. The latter officer, concerned with the impropriety of possession of the marijuana, turned it in to police headquarters. With respect to this charge, the Commission concluded:

Although appellant concedes he was in possession of a small portion of marijuana, the circumstances of that possession, a.) for the purpose of showing a fellow officer engaged in a Police Training Course which discussed that topic; b.) the fact that charges were never brought by either the officer or the Chief of Police, who were aware of that possession, and c.) the fact that marijuana is not a narcotic drug, convinced the Hearer that removal was too strong a penalty.

That marijuana is no longer classified, as it was prior to 1970 by *N. J. S. A.* 24:18–2(9), since repealed, as a narcotic drug, is of no moment and should have played no part in the Commission's conclusion. Its possession is still prohibited. One possessing 25 grams or less thereof is a disorderly person; one possessing more than 25 grams is guilty of a high misdemeanor. *N. J. S. A.* 24:21–20. Nevertheless, in the circumstances shown, were this the only incident demonstrative of Fallon's insensitivity to and disregard of his obligations as a police officer, "a special kind of public employee, [whose] primary duty is to enforce and uphold the law," *Moorestown Tp. v. Armstrong,* 89 *N. J. Super.* 560, 566 (App. Div. 1965), certif. den. 47 *N. J.* 80 (1966), we would be inclined to agree that dismissal therefor, in the case of a then novice police officer, was too harsh a penalty.

But that incident does not stand alone. Fallon's conduct thereafter, on the two occasions when he left his post without authority, showed a continued insensitivity to and disregard of the obligations of his office which fully justified the borough's determination that his removal as a police officer was warranted.

The Commission's conclusion minimizes the seriousness of these derelictions by stating:

The appellant did, in violation of police rules, leave his post without calling police headquarters. However, the location of his departure from his post, or the length of time, were not sufficient proof for this Hearer to gauge the seriousness of the offense.

The conclusion ignores the uncontroverted testimony as to the two incidents and the improper conduct of Fallon revealed thereby.

The first incident occurred on April 26, 1971 when Fallon was assigned to a walking patrol on the north side of Route 4. Without seeking permission or reporting his intent to police headquarters, Fallon left his post and entered the Patio Restaurant on the south side of Route 4 at about 5 P.M. on that day, remaining there for 15 to 20 minutes.

Unbeknownst to Fallon, Detective Gould was then in an office, adjacent to the restaurant, which was equipped with a "one way mirror which enables you to view the entire restaurant without being seen from anyone inside the restaurant." He was stationed there to listen through a receiver to conversations between an undercover agent carrying "electronic surveillance equipment," including a microphone, and one Timothy McGinnis, whom Gould had previously arrested for a narcotics violation.

According to Gould, Fallon approached McGinnis and the undercover agent and engaged them in a conversation, all of which Gould was able to hear via the electronic equipment. While Gould did not know whether Fallon was acquainted with the undercover agent, he was aware that Fallon knew McGinnis and of his prior arrests. Less than a week before, on April 20, 1971, Fallon, who had no connection with McGinnis' arrest or prosecution, had asked Gould whether he had "received the results of a urine test" taken from McGinnis on the occasion of his arrest. Gould answered "no" and reported the incident to the chief of police.

In the conversation overheard by Gould, Fallon and McGinnis spoke of the latter's arrest by Gould some weeks prior thereto and of an arrest of McGinnis made by another officer for driving while under the influence of narcotics. Fallon told McGinnis that his arrest by Gould was illegal since Gould didn't have a search warrant or probable cause to make the arrest and that "it would be thrown out of court."

As to McGinnis' arrest for driving while under the influence of narcotics, Gould testified:

\* \* \* apparently the ticket that was issued to him was issued in error, the date was wrong, and Patrolman Fallon told Timmy McGinnis not to let the police get a hold of his copy, that it's possible that the ticket could be thrown out if the police were not aware of the incorrect date at the time of the trial.

Despite this uncontradicted testimony the Commission concluded:

There was insufficient first-hand testimony to lend credible support to the charge that appellant had conversed with questionable persons while on post or in any other fashion violated section 132(E) of the Rules and Regulations of the East Paterson [now Elmwood Park] Police Department. — —

A section of the regulations which, the borough's resolution indicates, provides:

that a police.officer shall not converse with persons while on duty except on police business and then as briefly as possible.

However, we need not resolve whether Fallon's conduct in the Patio Restaurant violated the cited section of the regulations. What is significant is that such conduct was clearly at variance with a police officer's sworn duty and emphasizes the error of the Commission in treating Fallon's admitted absence from his post on April 26, 1971 as a trivial offense.

The same is to be said of Fallon's admitted absence from his post on the second occasion. The proofs showed that about 10:30 P.M. on October 23, 1971 Fallon drove his police automobile from the post at the south end of the borough to which he had been assigned to the home of George Mills located in the northerly end of the borough. Again Fallon had no authority to leave his post and failed to notify police headquarters that he was doing so or to note on his activity sheet that he had done so.

The uncontradicted testimony of Mr. Mills as to what transpired on that occasion underscores Fallon's unfitness to continue as a police officer. Mills testified that after Fallon had knocked on the door and had been admitted:

A * * * He sat down and he made a statement to me saying that, "We didn't know you lived here" and "We're not going to rob your apartment now."

Q Now, did you say anything to him after this statement was made to you? A Yes. Well, I was a little bit stunned and kind of asked him why he was on the force. And he gave me the feeling from what he was saying that —

MR. CONN: I'm going to object to any feelings.

THE WITNESS: Okay. Well then —

Q Just tell me exactly what he said.

A To the best of my recollection, he said, "It enables me to" —.

An objection, which was improperly sustained by the hearing officer, prevented the witness from detailing the balance of Fallon's statement. But what was testified to is damning enough. After about 10 or 15 minutes Fallon left the apartment when the radio of his police automobile sounded a call for him.

Mills' report of the incident to the chief of police, on the background of the previous incidents, triggered an investigation which culminated in an interview between the chief and Fallon on January 6, 1972. According to the chief:

I narrated all the specifics that I had [of the marijuana incident, the conversations in the Patio Restaurant overheard by Detective Gould, the report he had received from Mr. Mills and other incidents about which the Chief had some information] to Patrolman Fallon. I asked him if he would clear the air as to — that's the words that I did use, to clear the air, and to clear the name of the department in view of the confidence that the public must have of us and to what did he have to say on it of which Patrolman Fallon never answered. He denied them with a smile on his face.

The chief asked Fallon to submit to a polygraph test "to clear yourself and the department." Fallon refused and the chief suspended him from duty.

■■ We agree with the Commission that Fallon "was lawfully entitled to refuse" to submit to the polygraph test, and that his refusal afforded no basis for a disciplinary charge against him. However, the fact that the chief exceeded his authority in ordering Fallon to submit to a polygraph test did not prevent the borough from establishing by other evi-

dence, as it did, Fallon's several derelicitions — derelictions which demonstrated an "attitude of mind and approach to the obligations of his office fundamentally at variance with his sworn duty." *Asbury Park v. Dept. of Civil Service,* 17 *N. J.* 419, 429–430 (1955).

Apposite is what we said in *Moorestown Tp. v. Armstrong, supra*:

> It must be recognized that a police officer is a special kind of public employee. His primary duty is to enforce and uphold the law. He carries a service revolver on his person and is constantly called upon to exercise tact, restraint and good judgment in his relationship with the public. He represents law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public, particularly in a small community such as Moorestown. [89 *N. J. Super.* at 566]

The decision of the Civil Service Commission is reversed and the municipal order of removal of Fallon from his office as patrolman in the borough's police department is reinstated.